### In re ORGANOGENESIS INC., Debtor.

#### No. 02–16944–WCH.

United States Bankruptcy Court, D. Massachusetts, Eastern Division.

Oct. 19, 2004.

Andrew Z. Schwartz, Foley Hoag LLP, Boston, MA, for Debtor.

Kevin B. Callanan, Law Office Kevin B. Callanan, Norwell, MA, for Creditor.

### MEMORANDUM OF DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

#### I. Introduction

The issue before me is whether Organogenesis Inc. (the "Debtor") violated the

Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 *et seq.* In their proofs of claim, certain of the Debtor's former employees [1] (the "Claimants") asserted entitlement to back pay and benefits based on the Debtor's violation of the WARN Act when it terminated its employees and closed its manufacturing facility in Canton, Massachusetts without advanced written notice. The Debtor objected to the Claimants' proofs of claim, asserting that the its failure to give advance written notice is excused pursuant to notice defenses within the WARN Act. I held an evidentiary hearing and took the matter under advisement. I now overrule the Debtor's objection and allow the Claimants' proofs of claim.

The following constitutes my findings of fact and conclusions of law.

## II. Background

The facts are undisputed. The Debtor is a biomedical company whose chief product is *Apligraf,* a living skin supplement used in the treatment of venous leg and diabetic foot ulcers. The Debtor manufactures *Apligraf* at its facility located in Canton, Massachusetts (the "Canton Facility"). The *Apligraf* manufacturing process is regulated by the United States Food and Drug Administration, the New York State Health Department, and various other state and federal environmental agencies. Approximately 65% of the Debtor's workforce is involved in the *Apligraf* manufacturing process. The manufacturing employees are highly skilled, trained and educated.

*The Debtor's contract with Novartis Pharma AG*

*Apligraf* generated over 95% of the Debtor's revenue. Although the Debtor owned the manufacturing rights to *Apligraf,* the Debtor had contracted the exclusive world-wide marketing and distribution rights to another pharmaceutical company, Novartis Pharma AG ("Novartis").

Under the contract, Novartis was the Debtor's sole customer and would provide the Debtor with production forecasts for *Apligraf* which the Debtor was required to manufacture. The contract also obligated the Debtor to provide Novartis with *Apligraf* at a fixed price per unit that was significantly less than the per unit cost of production.[2] In essence, the contract obligated the Debtor to sell only to Novartis and to incur losses on every sale.

Not surprisingly, the contract with Novartis negatively impacted the financial stability of the Debtor and in May 2002, the Debtor had begun to seek potential financial and strategic partners with the intention of raising capital or creating a partnership so that it could reacquire the marketing rights to *Apligraf* from Novartis. At this time, the Debtor's management believed that re-acquiring *Apligraf* marketing rights and pairing it with the manufacturing rights would create significant value for the company.

*Negotiations Between the Debtor and Novartis, May through August 2002*

On May 24, 2002, the Debtor's president and CEO, Steven Bernitz ("Bernitz"), made a written offer to Novartis to re-

---

**1.** The Claimants are: Jane Andrews, Karen A. Giampaolo, Margaret Hirst, Dina Kazis–Panico, Hoda Mansour, John G. O'Brien, Daniel O'Rielly, Marc P. Pelletier, John C. Rodrigues, Jonathan E. Thayer, Tamyra A. Toole and Leon M. Silkins

**2.** In July 2002, the Debtor incurred production costs of $600 per unit of *Apligraf.* Pursuant to the contract, the Debtor was obligated to sell *Apligraf* to Novartis at a rate of $350 per unit for commercial sales and $90 per unit for non-commercial sales (i.e. demonstration purposes).

acquire the *Apligraf* marketing rights. On June 21, 2002, Novartis made a counter proposal to purchase the *Apligraf* manufacturing rights from the Debtor.

On June 24, 2002, the Debtor's Board of Directors (the "Board") rejected the Novartis proposal and submitted a counter offer. Specifically, the Debtor offered to relinquish manufacturing rights in exchange for $35 million in cash, the forgiveness of $10 million of debt and the assumption by Novartis of $15.5 million in debt.[3]

On July 3, 2002, Bernitz, on behalf of the Debtor, sent a letter to Novartis with a revised proposal for the reacquisition of the *Apligraf* marketing rights. Thereafter, the Debtor issued a press release (the "Press Release") on July 11, 2002, describing the Debtor's strategy to reach an agreement with Novartis, that stated:

> Organogenesis Inc. today disclosed that it has entered into discussions with Novartis Pharma AG to reacquire commercialization rights to *Apligraf*, a living, bilayered skin substitute.... Steven B. Bernitz, president and chief executive officer of Organogenesis, stated, ... "While we are optimistic that we can reach an agreement with Novartis and secure appropriate financing, if we are unsuccessful, we believe it would have a significant negative impact on the Company's financial condition. The lower than expected sales growth of *Apligraf* during the first two quarters of 2002 has prevented the Company from meeting its financial projections, has put significant financial pressure on the Company's capital resources, and has made it clear that the current arrangement with Novartis is unsustainable."

The Press Release further announced that the Debtor had approximately $3.7 million of cash on hand and as of July 2002, a cash burn rate of approximately of $ 1.1 million per month.[4] In essence, the Debtor had only enough cash on hand to continue operating for approximately three months.

At a meeting of the Debtor's Board on July 15, 2002, Herbert Stein, Michael Baronian and Dr. Anton Schraft were appointed as representatives of the Debtor authorized to negotiate with Novartis. At a subsequent Board meeting on July 24, 2002, Bernitz presented details of a proposal to create an entity to be jointly owned by the Debtor and Novartis ("New-

---

3. The Board's rejection of the Novartis offer and counter offer were communicated to Novartis in a letter written by Bernitz. In the letter, Bernitz also wrote:
   > While I continue to believe that the interests of both parties would be best served by a return to Organogenesis of the rights to market *Apligraf*... I also continue to agree with you that the status quo is intolerable to both of us.... Time is clearly of the essence. I must receive some constructive response from Novartis promptly, or Organogenesis and its Board will assume that Novartis has no interest in continuing efforts to resolve our differences.

4. In his testimony at the evidentiary hearing, Bernitz explained the issuance of the Press Release as an effort to let "Novartis know that [the Debtor] was not going to go quietly and let [the] business dwindle without making it somewhat painful for [Novartis]." Novartis did not respond favorably to the Press Release. In a letter to Bernitz, dated July 17, 2002, Novartis responded:
   > We have reviewed the press release issued by Organogenesis Inc. (the "Company") on July 11, 2002. We are puzzled as to why the Company would issue a press release regarding the existence of negotiations between the Company and Novartis ... for the sale of marketing rights to Apligraf when in fact any discussions between the parties were terminated prior to the issuance of the press release.... For the sake of absolute clarity, it is the position of Novartis that... prior to the issuance of the press release, the discussions regarding a sale of the marketing rights to Apligraf from Novartis to the Company have been terminated.

Co") to manufacture and sell *Apligraf*. At that meeting, Michael Baronian ("Baronian"), one of the negotiators, reported that the negotiating team was still trying to negotiate an agreement for the fair division of ownership between the Debtor and Novartis of the proposed NewCo, but that Novartis insisted on owning a majority share. Further, Baronian stated that he believed Novartis would finance the going forward cash burn of the Debtor, now approximately $2.2 million a month, until an agreement was reached.

On August 1, 2002, Baronian reported to the Board that Novartis was insisting on owning at least 60% of the proposed New-Co and that Novartis' lawyers were advising that the Debtor file a pre-packaged bankruptcy under Chapter 11 to confirm any *Apligraf* transaction. The Debtor's outside financial advisor advised the Board that if an agreement could not reached with Novartis, the Debtor had only two to three months of cash remaining, would not be able to obtain extra financing, and a sale of the company would not be viable. Finally, upon learning that several key employees were contemplating leaving the Debtor, the Board resolved to implement a retention and bonus plan for all non-officer employees.

At a meeting of the Board on August 28, 2002, Baronian reported an oral offer from Novartis to purchase the *Apligraf* manufacturing rights for $25 million, including $10 million in debt forgiveness and $5 million in debtor-in-possession ("DIP") financing. He also advised that his oral offer to reacquire the *Apligraf* marketing rights for $36 million had received an affirmative response from Novartis. The Board sug-

gested a letter be sent to confirm Novartis' willingness to sell the marketing rights for $36 million.

By letter dated August 30, 2002, the Debtor received a non-binding proposal from Novartis to acquire the Debtor's assets used in the development, manufacture, use, testing, importation, marketing, sale and distribution of *Apligraf*. Novartis emphasized that their proposed acquisition could only be possible if the Debtor was actively engaged in the manufacture of *Apligraf* at the time of the proposed transaction. In the accompanying term sheet, Novartis required:

> Prior to the closing, [the Debtor] shall conduct its business only in the normal and ordinary course subject to any limitations and restrictions imposed by the Bankruptcy Code, the credit facility, and the purchase agreement, and shall use its best efforts to preserve its business intact, to retain the services of its present employees, and to preserve the good will of its customers and suppliers.

*The Debtor's Efforts to Obtain Other Financing*

Between May and September 2002, the Debtor's management contacted over twenty potential strategic and financial partners with the objective of raising capital to reacquire the *Apligraf* marketing rights from Novartis.[5] On July 24, 2002, the Board retained Houlihan Lokey, an investment banker, to aid the Debtor in its efforts to raise capital and find a potential strategic partner. In addition, Houlihan Lokey was retained to perform a valuation analysis and a fairness opinion premised

---

5. At the evidentiary hearing, the Debtor proffered evidence of correspondence concerning identification of potential financiers to corroborate its efforts to obtain third party financing. The Debtor produced a detailed financial proposal from Broadmark Capital, including proposed strategies for the Debtor to raise capital to acquire the marketing rights for *Apligraf*, and an e-mail from Union Square Capital that acknowledged meetings with the Debtor's management and provided capital raising alternatives for the Debtor.

on the Debtor's continuing operations and a potential transaction with Novartis.

During this time, the Debtor's management believed that shutting down operations and taking *Apligraf* off the market, even temporarily, would pose a very large risk to the Debtor because it would be difficult to resume manufacturing at the Canton facility. Furthermore, the Debtor's management was aware that any potential agreements with third party financiers or strategic partners were contingent upon the reacquisition of the *Apligraf* marketing rights. Thus, continued negotiations with Novartis were deemed critical to the Debtor's survival.

*Negotiations Between the Debtor and Novartis, September, 2002*

At a meeting of the Board on September 3, 2002, Baronian reported that Novartis had set a deadline of September 30, 2002, for the Debtor to complete the purchase of the *Apligraf* marketing rights for $36 million. The Board did not accept the Novartis proposal and had serious questions of the viability of the offer and whether Novartis was acting in good faith. The Board resolved to reconvene on September 6, 2002, to decide whether to take action to safeguard amounts due employees, including the possibility of shutting down operations at the Canton Facility.

At the Board meeting on September 6, 2002, the Board resolved that employees be furloughed for one to two weeks to conserve the Debtor's cash reserves and absolve officers and directors of any personal liability for unpaid vacation time. In conjunction with the decision to furlough employees, the Board discussed the need to rehire key personnel in order to maintain the operational capacity of the Canton Facility. Significantly, the Board voted to make the final attempt to reach an agreement with Novartis and authorized outside counsel to prepare necessary papers to commence a bankruptcy filing.

In a letter to Novartis dated September 6, 2002, the Debtor's general counsel explained the reasons for the Debtor's previous rejection of Novartis' offer to acquire the *Apligraf* manufacturing rights. Specifically, the offer was rejected because the Debtor did not believe Novartis was offering fair market value for the *Apligraf* assets, the offer lacked sufficient definition and it was unclear whether Novartis' offer could realistically be implemented. Moreover, the letter stated:

> In order to protect Organogenesis from further harm, we are forced to cease shipments of Apligraf on Tuesday, September 10, 2002, unless we can implement an interim plan that will protect Organogenesis' interests while we attempt to come to some permanent agreement. The substance of the interim plan is attached, and must be implemented by the close of business on Tuesday [September 10, 2002].

The attached interim plan required that effective September 9, 2002, Novartis (i) pay the Debtor amounts due from sales of *Apligraf* from August 1 to September 6, 2002; and (ii) prepay in advance for at least 650 units of *Apligraf* per week at $ 750 per unit, calculated four weeks in advance of production.

Before a response was received from Novartis, on September 9, 2002, Bernitz sent a memo to the Debtor's employees announcing that, due to the lack of agreement with Novartis at that time, the Debtor would discontinue sales of *Apligraf* to Novartis as of the close of business that day and announced the two-week furlough of employees. The memo also advised that the Debtor was continuing to negotiate with Novartis and that all furloughed employees would continue to be employed by the Debtor.

On September 10, 2002, in a response letter to the September 6 letter from the Debtor's general counsel, Novartis rejected any implication that it had acted in bad faith and stated:

It remains our desire to reach an agreement with Organogenesis pursuant to which, through the seemingly inevitable bankruptcy proceeding, Novartis would purchase, at a fair price, the *Apligraf* manufacturing assets...

To this end we are willing to do the following. We will wire transfer to your account on Tuesday, September 10, the amount of $ 1.084 million in respect of past sales of *Apligraf* to Novartis.

This is conditioned upon an agreement by you to meet with us in New York on Friday, September 13 ... to negotiate in good faith a sale of the *Apligraf* assets. We expect at that time to consider all possibilities, including DIP loan and other issues raised by you in your proposed solution to the problem.

On the eve of the meeting with Novartis in New York, on September 12, 2002, the Board voted that the Debtor seek relief under chapter 11 of the Bankruptcy Code. The Board also approved a press release, to be issued on September 13, 2002, stating that the Debtor had temporarily halted sales of *Apligraf* to Novartis and that 110 employees had been placed on furlough for up to two weeks.

At the meeting with Novartis in New York, the Debtor's representatives proposed the sale of the Debtor's *Apligraf* manufacturing rights to Novartis for $31 million and forgiveness of $10 million in debt. Novartis, with a new research center planned to open in Cambridge, addressed its desire to avoid adverse publicity in the Boston area from failing to reach an agreement with the Debtor. No mention was made of the September 12 decision of the Debtor's Board to authorize a bankruptcy filing.

Following the meeting with Novartis, Bernitz sent a memo to the Debtor's employees on September 16, 2002, noting a productive meeting with Novartis and with another meeting scheduled for that week. The memo also advised that limited numbers of employees were being brought back to maintain the Canton Facility's operational capacity and that if a short term agreement could be reached with Novartis, the Debtor hoped to resume manufacturing at full capacity.

The Debtor and Novartis could not reach an agreement. In a final memo to the employees on September 20, 2002, Bernitz advised that Novartis had cut off all negotiations and was no longer interested in purchasing the *Apligraf* manufacturing rights from the Debtor. The memo advised that the Debtor's relationship with Novartis was terminated and that the Debtor would file for chapter 11 bankruptcy protection within the next few days. Finally, the memo stated the Debtor would terminate normal business operations for all employees and that their employment would be terminated effective at 8:00 a.m. on September 23, 2002.

At the evidentiary hearing, Bernitz testified that on September 23, 2002, the majority of the Debtor's employees were terminated, including the 110 employees that had been furloughed. Moreover, Bernitz testified, that about 15 employees were retained in order to keep the facility in Canton recoverable and to oversee the bankruptcy proceedings.

On September 25, 2002, the Debtor filed its petition for bankruptcy protection under chapter 11.

*Agreement Reached Between the Debtor and Novartis*

A post-petition agreement with Novartis resulted in the reopening of the Canton

manufacturing facility. Bernitz testified that in October 2002, the Debtor called back to work about 60 employees who had been terminated on September 23, 2002. I approved the agreement between the Debtor and Novartis on November 26, 2002.

### III. Analysis

■■■ A proof of claim executed and filed in accordance with the bankruptcy rules constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr.P. 3001(f). The burden is upon a debtor to offer substantial evidence to support its objection to a claim. *In re Hemingway Transport Inc.*, 993 F.2d 915, 925 (1st Cir.1993), *cert. denied*, 510 U.S. 914, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993). If a debtor satisfies its burden, the claimant is required to come forward with evidence to support its claims, *id.*, and bears the burden of proving its claims by a preponderance of the evidence. *In re WHET, Inc.*, 33 B.R. 424, 437 (Bankr.D.Mass.1983).

The issue before me arises from the Debtor's termination of its employees, including the Claimants, on September 23, 2002. It is undisputed that as of the date the Claimants were terminated, the Debtor met the threshold requirements for the applicability of the WARN Act. The Debtor concedes: (1) that it was an "employer" [6] for the purposes of the WARN Act;

(2) a "plant closing," as defined by the WARN Act, occurred when the Debtor closed the Canton Facility and terminated its employees effective September 23, 2002, and; (3) the Debtor gave no notice to its employees of their termination pursuant to the Act.

The purpose of the WARN Act is to protect workers, their families and their communities by requiring employers to give advance notice of a plant closing or mass layoff. *20 C.F.R. § 639.1(a)*.[7] Armed with advance notice, workers and their families are afforded time with which to prepare for the loss of employment by seeking new employment or obtaining job skills training to compete in the job market. *Id.* In order to achieve this purpose, the WARN Act mandates:

> An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order—
>
>> (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee . . .

*29 U.S.C. § 2102(a)*.[8]

Generally, if an employer fails to comply with the 60–day notice requirement, the employer is liable to each terminated employee for back pay and benefits for each

---

**6.** The WARN Act defines "employer" as any business enterprise that employs 100 or more employees. *29 U.S.C. § 2101(a)(1)(A)*.

**7.** The WARN Act specifically directs the Department of Labor to prescribe regulations as necessary to carry out the provisions of the Act. *29 U.S.C. § 2107(a)*. The Department of Labor promulgates such regulations pursuant to statutory authority, and "if substantive, they have the force of law . . ." *United Mine Workers of America v. Martinka Coal Co.*, 202 F.3d 717, 720, n. 2 (4th Cir.2000).

**8.** At the evidentiary hearing, the parties did not dispute whether the Claimants were "af-

fected employees." The WARN Act defines "affected employees" as "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass lay off by their employer." *29 U.S.C. § 2101(a)(5)*. The WARN Act goes on to define "employment loss" as "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6–month period." *29 U.S.C. § 2101(a)(6)*.

day in violation of the WARN Act. *29 U.S.C. § 2104(a).*

■ The WARN Act specifies certain defenses under which the notification period may be reduced to less than 60 days. *20 C.F.R. § 639.9.* In response to the Claimants' proofs of claim alleging the Debtor's violation of the WARN Act, the Debtor contends that both the "faltering company" and the "unforeseeable business circumstances" defenses excuse the Debtor's failure to issue a WARN Act notice on July 25, 2004, 60–days prior to the September 23, 2002 termination of the Claimants, or at anytime thereafter. To rebut the Claimants' proofs of claim, the Debtor "bears the burden of proof that the conditions for the exceptions have been met." *20 C.F.R. § 639.9.*

■ The Claimants counter that neither defense is applicable to the facts of this case, and even if I were to find either defense applicable, the Debtor violated the requirement that it give less than 60 days notice as soon as was practicable prior to the Claimants' termination. An employer relying on these defenses "shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." *29 U.S.C. § 2102(b)(3); see also 20 C.F.R. § 639.9.*[9] Furthermore, *29 U.S.C. § 2102(b),* wherein the defenses are found, is entitled "*Reduction* of notification period" *(emphasis supplied)* and does not contemplate the complete elimination of the prescribed 60–day notice period.[10]

■ The Debtor has admitted its failure to give *any* written notice whatsoever under the WARN Act to the Claimants. It cannot rely on the asserted defenses that require an employer to have given *reduced* notice as soon as practicable.[11] *See United Paperworkers Int'l Union v. Alden Corrugated Container Corp.,* 901 F.Supp. 426, 440 (D.Mass.1995) (noting that where an employer has failed to provide any written

9. Specifically, *20 C.F.R. § 639.9* directs "[t]he employer must, at the time notice is actually given, provide a brief statement of the reason for reducing the notice period, in addition to the other elements set out in § 639.7." *20 C.F.R § 639.7(d)* provides:

Notice to each affected employee who does not have a representative is to be written in language understandable to the employees and is to contain:
(1) A statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect;
(2) The expected date when the plant closing or mass layoff will commence and the expected date when the individual employee will be separated;
(3) An indication whether or not bumping rights exist;
(4) The name and telephone number of a company official to contact for further information.
The notice may include additional information useful to the employees such as information on available dislocated worker

assistance, and, if the planned action is expected to be temporary, the estimated duration, if known.

10. Indeed, the WARN Act only mentions a single category of unforeseeable business circumstance where "no notice" is permissible. Pursuant to *29 U.S.C § 2102(b)(2)(B)* "no notice under this chapter shall be required if the plant closing or mass layoff is due to any form of natural disaster, such as flood, earthquake, or the drought currently ravaging the farmlands of the United States."

11. Even assuming without deciding that the September 20, 2002 memorandum notifying the Debtor's employees of their termination contained the elements of notice required by *20 C.F.R. § 639.7,* it nonetheless fails to provide WARN Act notice. The memorandum failed to follow the mandate of *20 C.F.R. § 639.9,* requiring a brief explanation for reduction of the 60–day notice period. This failure alone is grounds to find that the memorandum does not provide sufficient notice. *See Grimmer v. Lord Day & Lord,* 937 F.Supp. 255, 257 (S.D.N.Y.1996).

notification pursuant to the "unequivocal mandate" of the WARN Act, "this failure alone would constitute sufficient grounds to deny the applicability of the exemption provisions"); *see also Watts v. Marco Holdings,* 1998 WL 211770, *1–2, 1998 U.S. Dist. LEXIS 4647, *4 (N.D.Miss.1998) (holding that despite an unforseen business circumstance which in part caused the closure of the employer's plant, the employer's failure to give as much notice as practicable is a violation of the WARN Act); *Childress v. Darby Lumber, Inc.,* 126 F.Supp.2d 1310, 1318 (D.Mont.2001) (noting that an employer would still be liable regardless of the application of the faltering company or unforeseeable business circumstances defenses where notice is inadequate); *Barnett, et. al., v. Jamesway Corp. (In re Jamesway Corp.),* 235 B.R. 329, 343 (Bankr.S.D.N.Y.1999) (holding when an employer failed to give WARN Act notice, "it cannot assert either the 'not reasonably foreseeable business circumstances' or 'faltering company' exception to the Act as a defense to liability"). Despite this failure, I will address the Debtor's faltering company and unforeseeable business circumstances defenses in full.

## 1.  Faltering Company Defense

The faltering company defense provides:

An employer may order the shutdown of a single site of employment before the conclusion of the 60–day period if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business.

*29 U.S.C. § 2102(b)(1).*

■ The faltering company defense is applicable to "plant closings but not to mass layoffs and should be narrowly construed." *20 C.F.R. § 639.9(a).* A plant closing is defined as "the permanent or temporary shutdown of a single site of employment ...if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding any part-time employees." *29 U.S.C. § 2101(a)(2).* Claimants contend that the shutdown of the Canton Facility does not constitute a plant closing because the Debtor retained employees to maintain operational capacity and, therefore, the Debtor cannot avail itself of the faltering company defense. I conclude otherwise. "An employment action that results in the effective cessation of production or the work performed by a unit, even if a few employees remain, is a shutdown" sufficient to qualify as a plant closing. *20 C.F.R. § 639.3(b).* Here, the production of *Apligraf* effectively ceased with the furlough and subsequent termination of employees, as no new product was being produced and the few employees who remained did so with the purpose of maintaining the production facilities in the event circumstances allowed production to resume.

■ In order for the Debtor to assert this defense successfully the regulations require (1) that it identify specific actions taken to seek new capital or business at the time when the 60–day notice would have been due; (2) it must have had a realistic opportunity to obtain the sought after financing or business; (3) such financing or business sought must have been sufficient, if obtained, to postpone or prevent the plant closing; and (4) it had to believe reasonably and in good faith that

giving the required termination notice would have precluded the ability to obtain the needed financing or business. *20 C.F.R. § 639.9(a)*.

As of July 25, 2002, the date that the 60–day notice would have been due, it is clear the Debtor was seeking new capital. Whether the Debtor's opportunity to obtain such capital was realistic is less clear. In a letter to the Debtor, dated July 17, 2002, Novartis clarified that negotiations concerning the Debtor's reacquisition of *Apligraf* marketing rights had been terminated prior to July 11, 2002. As any third party financing was contingent upon the Debtor's re-acquisition of those rights, this letter indicates that as of July 25, 2002, no third party financing was realistic. Indeed, I cannot give any significant weight to the capital raising and financing proposals from Broadmark or Union Square Capital because neither contained a commitment of any sort and were merely proposals to encourage the Debtor's retention of the respective firms. Furthermore, as of July 25, 2002, although there was a new proposal by the Debtor's Board to create a joint Newco between the Debtor and Novartis, no commitment or agreement could be reached. Therefore, I conclude that as of the date 60–day notice was due the Claimants, July 25, 2002, there was no realistic chance of the Debtor obtaining the sought after financing from a third party or Novartis.

As to whether obtaining the needed financing would have prevented or postponed the closure of the Canton Facility, I note that subsequent to the Debtor's bankruptcy filing, the Debtor reached an agreement with Novartis through and was able to resume production at the Canton Facility. Furthermore, as of October 2002, the Debtor had rehired approximately sixty of the employees terminated on September 23, 2002.[12] Accordingly, if negotiations between the Debtor and Novartis had not failed, the Debtor could have avoided or postponed closing the Canton Facility.

The final element of the faltering company defense requires that the Debtor reasonably and in good faith believed that giving the required WARN notice would have precluded the Debtor's ability to obtain financing from Novartis or other parties. The Debtor contends that if it gave advance written notice of termination, its specially trained employees would have left for other jobs and Novartis would have cut off negotiations. The facts support the Debtor's contention. On August 1, 2002, the Debtor's Board instituted a bonus and retention plan to prevent key employees from leaving. Furthermore, it is apparent that in Novartis' proposal and term sheet of August 30, 2002, Novartis did require the Debtor's active and continuing manufacture of *Apligraf* and expected the Debtor to "use its best efforts to preserve its business intact... [and] to retain the services of its present employees." Upon these facts, it is apparent that Debtor did have a reasonable and good faith basis to believe that providing its employees with WARN Act notice as early as July 25, 2002 would have caused a loss of skilled employees and resulted in the further breakdown of negotiations with Novartis.

---

12. The Claimants argue that I cannot look to the post-petition agreement between the Debtor and Novartis to establish objectively that if a deal had been reached prior to the closure of the Canton Facility on September 23, 2002, said closure would have been avoided. However, the Claimant's have cited no authority that restrains me from considering such evidence in determining the issue. The fact that the Debtor was able to resume production and rehire approximately one- half of the terminated employees upon the consummation of a deal with Novartis is indeed the best evidence that a pre-closure deal with Novartis would have avoided a shutdown.

However, even if the faltering company defense applied to the Debtor's failure to give its employees WARN Act notice on July 25, 2002, the Debtor was still required to give "as much notice as is practicable." *29 U.S.C. § 2102(b)(3).* Here, as the Debtor admitted, no WARN Act notice was ever given to its employees. Nonetheless, the Debtor cautions that "refusing to apply the [faltering company] exception here would be tantamount to writing it out of the statute." I disagree.

As previously noted, the WARN Act clearly requires that even when the faltering company defense applies, notice must be given as soon as is practicable. Indeed, where the defense applies, "the need for notice will only be triggered if the employer fails to obtain the business or financing it seeks." *Worker Adjustment and Retraining Notification Act,* 54 F.R. 16042 (April 20, 1989). Here, as of Friday, September 20, 2002, the Debtor's negotiations with Novartis had been terminated and the Debtor had informed its employees that they would be terminated as of Monday, September 23, 2002, at 8:00 A.M. I find the suggestion untenable that on September 20, 2002, it would have been impracticable to give proper notice required by the WARN Act. Indeed, any impracticability of giving notice previously asserted by the Debtor would have been absent. Accordingly, by failing to give *any notice,* the Debtor has failed to comply with the requirements of the WARN Act and is in violation thereof.

2. *Unforeseeable    Business    Circumstances Defense*

The unforeseeable business circumstance provides:

An employer may order a plant closing or mass layoff before the conclusion of the 60 day period if the closing or mass layoff is caused by business circum-

stances that were not reasonably forseeable as of the time that notice would have been required.

*29 U.S.C. § 2102(b)(2)(A).*

■ The unforeseeable business circumstances defense requires a two-step analysis, causation and foreseeability. *See Jurcev v. Central Comm. Hosp.,* 7 F.3d 618, 622–24 (7th Cir.1993). If the plant closing or mass layoff "was not 'caused' by the asserted business circumstance, the defense cannot apply." *Snider v. Commercial Fin. Serv., Inc.,* 288 B.R. 890, 895 (N.D.Okla.2002).

■ The Debtor asserts that the unforeseeable business circumstance which led to the closure of the Canton Facility and the termination of its employees on September 23, 2002, was the failure of the Debtor's negotiations with Novartis, an unforeseeable event as of July 25, 2005.

Even assuming without deciding that the failure of negotiations with Novartis was the cause of the closure of the Canton Facility, the facts nonetheless prove that the failure of negotiations with Novartis was indeed foreseeable. In evaluating foreseeability:

(1) An important indicator of a business circumstance that is not reasonably foreseeable is that the circumstance is caused by some sudden, dramatic and unexpected action or condition outside the employer's control. A principal client's sudden and unexpected termination of a major contract with the employer, a strike at a major supplier of the employer, and an unanticipated and dramatic major economic downturn might each be considered a business circumstance that is not reasonably foreseeable . . . .

(2) The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's

business judgment. The employer must exercise such commercially reasonable business judgment as would a similarly situated employer is predicting the demands of its particular market . . . .

*20 C.F.R. § 639(b).*

The failure of negotiations with Novartis was not a sudden, dramatic and unexpected action or condition outside the Debtor's control. The financial instability of the Debtor was apparent as early as May 2002 when the Debtor began to seek financial or strategic partners to aid in the repurchase the *Apligraf* marketing rights from Novartis. The Press Release, dated July 11, 2002, further showed the Debtor's cognizance of its precarious fiscal situation when it noted if negotiations with Novartis were unsuccessful "it would have a significant negative impact on the [Debtor's] financial condition" and that "the current arrangement with Novartis is unsustainable."

Indeed, after numerous negotiations, offers, counter offers and rejections between May and September 2002, the Debtor's Board on September 6, 2002, voted to make a *"final attempt"* to reach an agreement with Novartis and authorized the Debtor's outside counsel to begin preparations for a bankruptcy filing. The fact that the Debtor began to plan for its bankruptcy in conjunction with authorizing a final attempt at negotiations with Novartis demonstrates that in the business judgment of the Board, the negotiations very well might fail and a bankruptcy filing would be necessary. The failure of negotiations was not some unforeseeable occurrence as contemplated by the WARN Act, but rather the foreseeable end of the long drawn out death rattle that was the Debtor's contractual burden to Novartis.

### 3. Good Faith

Finally, the Debtor contends that if it is found liable for violating the WARN Act, its liability should be reduced because it acted in good faith. In support of this contention, the Debtor points to the two memoranda from Bernitz to the Debtor's employees, dated September 9, 2002, and September 16, 2002. The Debtor argues that these memoranda evidence the Debtor's policy of openness to keep its employees apprised of the status of the Debtor's business and financial state and should therefore reduce the Debtor's liability.

Where an employer has been found to violate the notice provisions of the WARN Act, a court may, in its discretion, reduce the amount of the liability if the employer has proved to the court's satisfaction that the violation was in good faith and the employer had reasonable grounds to believe the act or omission was not in violation of the statute. *29 U.S.C. § 2104(a)(4).* To establish a good faith, an employer must show a subjective intent to comply with the [WARN] Act as well as evidence of objective reasonableness by the employer in applying the Act. *Childress v. Darby Lumber Inc.,* 126 F.Supp.2d 1310 (D.Mont.2001) (*citing In re Jamesway Corp.,* 235 B.R. 329, 345 (Bankr.S.D.N.Y.1999)). Here, the Debtor cannot avail itself of the WARN Act's good faith provision to reduce liability because no evidence indicates the Debtor's subjective intent to comply with the Act. There is no evidence to show that the Board considered the applicability of the WARN Act at any of the meetings that occurred between May and September 2002. Furthermore, although the Debtor's human resources director testified that she had conversations with the Debtor's comptroller and general counsel concerning the WARN Act, the comptroller testified that the conversations occurred *after* the Debtor's bankruptcy filing on September 25, 2002.

The weight of this evidence tends to indicate that the Debtor was unaware of its obligations under the WARN Act prior to the termination of its employees. Mere ignorance of the WARN Act is not enough to establish good faith because it fails to show either a subjective intent to comply or an objective reasonableness in the application of the Act. *Childress v. Darby Lumber Inc.*, 357 F.3d 1000, 1008 (9th Cir. 2004). Accordingly, I cannot apply the good faith provision to mitigate the Debtor's liability under the WARN Act.

### 4. Damages

■ I have determined that the Debtor may not avail itself of the faltering company or unforeseeable business circumstances defenses and concluded that the Debtor did not have the requisite good faith to justify a reduction in liability. As a result, the Debtor is liable to the Claimants for the maximum violation period. *See 29 U.S.C. § 2104(a)*. At the evidentiary hearing, the Debtor stipulated that if the Claimants were to prevail, the amounts requested in the Claimants' proofs of claim accurately reflected the measure of damages. Furthermore, the Debtor stipulated that in conformity with the prevailing view, the first $4,650 of any allowed claim would be considered wages entitled to a priority claim pursuant to *11 U.S.C. § 507(a)(3)*. Accordingly, I overrule the Debtor's objection to the Claimants' proofs of claim and allow them in full. Further, the first $4,650 of each proof of claim is entitled to priority under *11 U.S.C. § 507(a)(3)* and any amount over and above $4,650 shall be treated as a general unsecured claim.

■ Finally, the Claimants have asserted a claim for reasonable attorney's fees in their Post—Trial Brief. Pursuant to *29 U.S.C. § 2104(a)(6)*, in any WARN Act suit "the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs." *Id.* This is the first instance in which the Claimants have asserted a claim for attorney's fees. The Claimants did not request relief in the form of attorney's fees in either their proofs of claim or the Joint Pre–Trial statement, but instead limited the relevant damages to back pay and benefits claimed for the Debtor's violation of the WARN Act.

Here, the Claimants stipulated in the Joint Pre–Trial Statement that it "shall supercede the pleadings and govern the course of trial of this cause." Accordingly, as the Claimants did not raise the issue of attorney's fees as a measure of damages until after the evidentiary hearing, I deny the Claimants' request for attorney's fees.

### IV. Conclusion

For the reasons stated above, I will enter an order overruling the Debtor's objection to the Claimants' proofs of claim and deny the Claimants' request for attorney's fees.